Madden, Judge,
delivered the opinion of the court:
This suit is brought by the trustees in bankruptcy of the •Choctaw, Oklahoma & Gulf Railroad Company (hereinafter referred to as the Railroad) to recover from the United States ■alleged overpayments on the purchase price of coal deposits in lands owned in fee by the Choctaw and Chickasaw Nations.
Under the authority of an act of June 28,1898, 30 Stat. 495, the mining trustees of the Choctaw and Chickasaw Nations leased to the Railroad for a period of thirty years beginning February 21, 1899, several developed and undeveloped tracts of coal deposits in the segregated mineral area of the Choctaw .and Chickasaw Nations. Each tract was covered by a separate lease. Each lease provided for the payment as royalty •on the production of all coal mines developed on the tract a •stipulated sum for every ton of coal produced; each lease .also provided that the lessee should pay on each mine or *606 claim, developed or undeveloped, within the tract covered by the lease, a certain amount each year as advance royalty, on the understanding that such payments would be credited on royalty when the mine was developed and operated and its production was sufficiently large that the production royalties exceeded the advance payments.
By an act approved February 8,1918,40 Stat. 483, Congress authorized the Secretary of the Interior to sell at public auction the coal and asphalt deposits, leased and unleased, in the segregated mineral area of the Choctaw and Chickasaw Nations and to make all necessary regulations for the sale. With reference to the lands on which there were leases, the act provided that such lands should be sold subject to all rights of the lessee, that advance royalty paid by any lessee and standing to his credit should be credited by the purchaser to the extent of the amount thereof and that no royalty should be paid to the purchaser by the lessee until the advance royalty was exhausted at the rate of eight cents per ton mine run. After giving the lessee a preferential right to purchase the coal deposits embraced in any lease held by him by paying the highest price offered by any responsible bidder if the bid price was not less than the appraised value, the act went on to provide that “if any lessee becomes the purchaser of any coal deposits on any undeveloped lease owned by him, then one-half of the advance royalties paid by any lessee on such, lease shall be credited on the purchase price thereof, and any residue of advance royalties heretofore paid by any lessee shall be credited to such lessee on account of any production of coal on any other lease which he may own and operate.”
Up to the time that the lands were offered for sale at auction, December 11,1918, the Bailroad had paid total advance royalties of $125,929.64 on the developed leases. Of this amount, $105,845.68 had been credited against the royalties for the production of coal, leaving an unused balance of $20,078.96. The advance royalties on the undeveloped tracts paid during the same time amounted to $84,400.
The auction sale of the lands was held December 11, 1918, under the supervision of the Superintendent of the Five Civilized Tribes. The Bailroad bid on all the tracts on which it had leases, developed and undeveloped, and its bids were *607 accepted by the Superintendent and forwarded to the Secretary of the Interior for his approval. The total amount of its bids was $526,073.50. The act and regulations required a down payment of twenty percent, the remainder to be paid in “four equal annual installments from the date of the sale,” all deferred payments to bear interest at the rate of five percent and to mature before “the expiration of four years after the date of such sale.”
The Railroad’s bids were not approved by the Secretary of the Interior until August 29,1919, and between that time and the time that the sale was held, the Railroad had paid production royalties under its leases amounting to $35,193.14.
Plaintiffs’ first claim relates to these (production) royalties. They contend that the royalties paid between December 11 and August 29 should have been credited on the purchase price on the theory that the sale was effective from December 11, 1918, with interest on the deferred payments running from that date. The Railroad had paid interest from December 11, but the Secretary ruled that interest should run from the date of the approval, August 29, 1919, and directed the Superintendent to credit on the purchase price interest paid before, that date. The Railroad protested. Plaintiffs here, of course, have reduced their claim as to the application of production royalties to the extent of the credit for interest allowed the Railroad at that time.
We cannot agree with plaintiffs that the sale was effective as of December 11, 1918. The act itself sheds little light on the problem. It authorized the Secretary to prescribe the necessary rules and regulations for the sale, and it seems clear from the regulations that any sale was to be only tentative until the approval of the Secretary had been obtained. Section 1 authorized the Superintendent of the Five Civilized Tribes to hold the sale, subject to the approval of the Secretary of the Interior. Section 3 gave the Superintendent authority to sell to the highest and best bidder, subject to the approval of the Secretary. Section 15 directed that immediately after any sale schedules of successful bidders should be prepared and forwarded to the Commissioner of Indian Affairs for approval or disapproval. Section 16 provided that after the approval of any bid the bidder should be furnished *608 with a certificate of purchase describing the tracts and setting' forth the terms on which title could be obtained; the certificate was to entitle the purchaser to possession. If a successful bidder was not entitled to possession until his bid had been approved, the continued possession of the Railroad must have been as lessee, under the terms of the lease and subject to the-burdens of the lease, one of which was the payment of royalty.
The only reference in the regulations to the payment of royalties to the purchaser is found in section 18, which provided that all royalty paid subsequent to the date of approval should belong to the purchaser. It must have been intended that royalty paid before that time was to continue to be paid to the superintendent for the benefit of the Indian owners. Consistent with these regulations was the decision to charge-interest on the deferred payments from the date of the Secretary’s approval of the bids.
Plaintiffs rely upon cases of conveyances by individual Indian owners where the approval of the Secretary of the-Interior was required, and, when given, was held to relate back to the date of the deed, making the conveyance effective as of that time. But the danger of injustice to a purchaser for value because of an intervening change in circumstances, evidently a reason for those decisions (see Lykins v. McGrath, 184 U. S. 169), is not present here, and in view of the provisions of the regulations there is no sufficient reason for the application of the doctrine of relation back in this case.
When the Railroad paid its second installment on the purchase price December 6, 1919, it deducted therefrom the sum of $11,200, one-half of the amount of the advance royalty standing to its credit on the undeveloped leases at the time that the auction sale was held. The payment was received by the superintendent and credited to the Railroad.
When the third installment became due, the Railroad deducted from the amount due the sum of $9,460.25, the amount of its production royalties due for January and February 1920, though it had not, in fact, paid those royalties. Its reason for making this deduction was that it claimed the right to credit the remaining one-half of the $34,400 advance royalty on the undeveloped leases against production royalty, and its deduction was in partial execution of that claim. The *609 defendant’s agent consented, at that time, to this- decLuction.. Since the Railroad was now in possession of the tracts as purchaser, the production royalties it was required to pay were in fact not those of a lessee but royalties required of all purchasers under Regulation No. 13 which was as follows:
Until full and final payment is made for any tract,, leased or unleased, sold under these regulations, the purchaser shall pay or cause to be paid to the Superintendent for the Five Civilized Tribes, monthly, 8 cents per ton for all coal mined * * *, such payments to be held by said Superintendent to be applied on the purchase price and, upon the request of the purchaser, may be applied in payment of any installment when due.
We show hereinafter that the Railroad had no right to make the deduction of $9,460.25.
The Railroad paid the full amount of its remaining two installments under protest, demanding credit on the purchase price of all the. advance royalty standing to its credit on the developed leases on December 11, 1918 ($20,078.96), and the balance of the advance royalty on the undeveloped leases remaining after the two credits allowed ($7,739.75). It also asked, as we have seen above, credit for production royalties paid between December 11,1918, and August 29,1919, which, deducting the credit allowed for interest paid during that time ($15,180.75), amounted to $20,112.39, making a total claim for $47,931.10. After more than a decade of correspondence between the Railroad and the Interior Department, the claim was finally rejected December 12, 1932.
There is nothing in the act of 1918 to support plaintiffs’’ claim that the residue of advance royalty should have been applied to the purchase price. The only provision in the statute relating to credits on the purchase price in favor of the lessee is that in section 4, giving the lessee who purchased the coal deposits in any undeveloped lease held by him credit on the price to the extent of one-half of the advance royalty-paid on such lease. The Railroad was given that .credit in making its second payment. From’the committee hearings and debates on the bill which became the Act of February 8,. 1918, it is clear that that was the only credit on purchase price intended to be allowed the lessees. See 64th Congress, Hear *610 ings before a Subcommittee of the Committee on Indian Affairs on H. R. 12544, part 3, p. 101-126; 56 Congressional Record, part 1, p. 209. In fact, that provision was a compromise by the Committee between the desires of the lessees, who wanted credit for all the advance royalty, and the representatives of the Tribes, who objected to the allowance of any credit, claiming that the advance royalty should be regarded as the price paid by the lessee for the exclusive possession of the land and the power to keep it from competitors.
The act fully protected the lessee where the land was bought by a third party. Such a purchaser was required to give the lessee credit for all advance royalties paid and standing to his credit and the lessee was not to pay royalty until that credit was exhausted. That factor must have been taken into consideration by the purchaser in fixing the amount of his bid. There was no provision in the act for turning over the advance royalty to the purchaser (see 35 Op. A. G. 259, ruling void a section of the regulations that authorized payment of the advance royalty to the purchaser for the benefit of .the lessee).
The act permitted the lessee to shift credits from one lease to another. When the leases were made, each tract was covered by a separate lease and each lease was independent of any other; advance royalty on any one lease could not be credited against production royalty on any other. Section 4 of the act, after allowing the lessee credit of one-half of the advance royalty on any undeveloped lease owned by him, provided that “any residue of advance royalties heretofore paid by any lessee shall be credited to such lessee on account of any production of coal on any other lease which he may own and operate.” This provision would permit a lessee who held both developed and undeveloped leases to transfer the credit for advance royalty on the undeveloped lease, which the act provided that he was not to lose, to an operating lease, to be credited on production royalty by the purchaser. But it could by its terms apply only where the lessee of the undeveloped lands continued to operate on some other lands as lessee.
Plaintiffs would have this provision mean that the residue of advance royalty could be applied to the production royal *611 ties which the Railroad, like all other purchasers, was required to pay as a security for the ultimate payment of the-purchase price, and then credited against the purchase price.. The difficulty is that the act reads “shall be credited on account of any production of coal on any other lease which he may own and operate.” Here the Railroad no longer owned any leases and it had received all the credit on the purchase-price because of advance royalty to which the act entitled it.
Since, in the view which we have taken of the merits of plaintiffs’ claim, they are not entitled to recover, it is unnecessary to consider, and we do not decide, the questions as to whether the defendant is properly subject to suit, and as to whether the statute of limitations has run. We conclude, therefore, that the petition must be dismissed. It is so ordered.
Jones, Judge; Whitakek, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.